No. 17-55208

------------------------------------------------

IN THE UNITED STATES COURT OF APPEAL
FOR THE NINTH CIRCUIT


JENNY LISETTE FLORES, *et al.*,
*Appellees,*

v.

JEFFERSON B. SESSIONS III, *et al.*,
*Appellants.*

------------------------------------------------

PLAINTIFFS'/APPELLEES' OPPOSITION TO EMERGENCY MOTION TO STAY ORDER

ENFORCING SETTLEMENT OF CLASS ACTION

CENTER FOR HUMAN RIGHTS
& CONSTITUTIONAL LAW
Carlos R. Holguin
Peter A. Schey
256 S. Occidental Blvd.
Los Angeles, California 90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484

*Of counsel:*
YOUTH LAW CENTER
Virginia Corrigan
200 Pine Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 543-3379

HOLLY S. COOPER
Director, Immigration Law Clinic
University of California Davis
School of Law
One Shields Ave. TB 30
Davis, California 95616
Telephone: (530) 754-4833

OUTLINE OF CONTENTS

I    Introduction ................................................................................. 1

II   Defendant satisfies none of the requirements for issuance of stay. ............... 7

     A    There is scant likelihood Defendant will prevail on appeal. ............... 8

     B    ORR's resuming compliance with a long-standing agreement does not
          constitute irreparable injury ................................................ 9

     C    Granting a stay would irreparably injure detained children. .............. 16

     D    The public interest is served when detained children receive neutral
          and detached oversight of the reasons for their confinement. ........... 18

III  Conclusion ................................................................................ 20

I    INTRODUCTION

On January 28, 1997, the court below approved a class-wide settlement of this action. Exhibits in Support of Motion to Enforce Settlement, February 3, 2015 (D.Ct. Dkt. 101), Exhibit 1, *reproduced at* Appendix 1 ("Settlement"). The Settlement sets minimum standards for the detention, housing and release of non-citizen juveniles detained on charges of being in the U.S. without authorization.

The Settlement binds the successor agencies to the former Immigration and Naturalization Service ("INS"), including appellant/defendant Department of Health and Human Services' Office of Refugee Resettlement ("Defendant" or "ORR").[1] For some 19 years[2] the Settlement has guaranteed class members the

─────────────────

[1] The Settlement protects "all minors who are detained in the legal custody of the INS," and binds the INS and Department of Justice, as well as "their agents, employees, contractors, and/or successors in office." Settlement ¶ 1.

In 2002, the Homeland Security Act, Pub. L. 107-296 (H.R. 5005) ("HSA"), dissolved the INS and transferred most of its functions to the Department of Homeland Security ("DHS"). 6 U.S.C § 279. Congress directed, however, that the ORR should have authority over unaccompanied minors detained pursuant to the Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq*. ("INA"). *Id*.

The HSA included savings provisions that continue the Settlement in effect as to the INS's successor agencies. HSA §§ 462(f)(2), 1512(a)(1). HHS has recognized that the Settlement continues to protect juveniles in its custody. *E.g.,* www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2 and www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-3#3.1 (last checked December 4, 2015).

[2] Although the Settlement contains a five-year sunset clause, in 2001 the parties stipulated that it shall remain binding until "45 days following defendants'

right to a hearing, known as a "bond redetermination," *see* 8 C.F.R. §§ 1003.19(a), 1236.1(d) (2015), as a procedural check against needless confinement: "A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing." Settlement ¶ 24A.[3] Paragraph 24A encourages the Government to comply with its "general policy favoring release" of juveniles and ensures that minors may be heard on whether continued detention is "required either to secure [their] timely appearance ... or to ensure the minor's safety or that of others..." Settlement ¶ 14.

On November 23, 2015, however, HHS announced that it no longer considered itself bound by ¶ 24A and would not present detained children for hearings as ¶ 24A requires. Email from Office of Immigration Litigation, Nov. 23, 2015 (D.Ct. Dkt. 239-2), Exhibit 1-ORR.

On January 20, 2017, the district court ordered ORR to resume complying with ¶ 24A. Order re Plaintiffs' Motion to Enforce (D.Ct. Dkt. 318) ("Enforcement Order"). On February 17, 2017, Defendant appealed and filed an emergency

---

publication of final regulations implementing this Agreement." D.Ct. Dkt. 101. The Government has never published such regulations.

[3] Effective April 1, 1997, administrative proceedings to determine a non-citizen's right to be or remain in the United States have generally been re-designated as "removal," rather than "deportation" proceedings. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. 104-208, Div C, § 309(a), 110 Stat. 3009 (1996).

motion pursuant to Ninth Circuit Rule Rule 27-3(a) to stay the district court's order. Plaintiffs oppose defendant's motion on the following grounds:

First, defendant's contention that they would suffer irreparable injury were the order to remain in effect is legally and factually specious. Apart from the cost and inconvenience of providing a hearing, it is virtually self-evident that ORR could experience *no* appreciable detriment—much less irreparable injury—simply by giving a child an opportunity to be heard on the cause for detaining him or her. It is well established that neither cost nor inconvenience amount to irreparable injury warranting a stay.[4]

Second, the district court's order merely requires ORR to do what the Government agreed it would do when it entered into the Settlement. If the Government wished to relieve ORR from having to give children a hearing on the

---

[4] The record indicates that Defendant is likely ignoring the district court's order regardless. Declaration of Helen Lawrence, Jan. 30, 2017, Exhibit 21-ORR (D.Ct. Dkt. 331-1, *reproduced at* Appendix 2, at ¶ 5 ("Lawrence II") (class member Edwin Aguayo detained since May 8, 2015; as of Jan. 30, 2017, "... ORR still hasn't presented Edwin for a bond redetermination hearing .., nor has it advised [counsel] when it will ..."). Nor, by recent accounts, is ORR following the district court's order even now. Declaration of Helen Lawrence, Feb. 20, 2017, Exhibit A, at ¶ 2 (no detained client has yet received a bond hearing); Declaration of Cecilia Candia, Feb. 20, 2017 Exhibit B (same).

- 3 -

reasons for their confinement, it had only to promulgate regulations and thereby sunset the Settlement entirely. It has failed to do so.[5]

Fourth, Defendant's legal position—that the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, 110 Pub. L. 457, 122 Stat. 5044, *codified in pertinent part at* 8 U.S.C. § 1232 ("TVPRA"), abrogates Settlement ¶ 24A—is meritless. Congress's aim in enacting the TVPRA was to confer greater protections on detained children, not strip them of their right to be heard on the Government's reasons for confining them. The district court's order furthers Congress's goal of minimizing the detention of children.

On the other hand, staying the district court's order would result in certain and irreparable injury to detained children. The uncontroverted evidence of record establishes the following:

- Needlessly detaining children—especially in prison-like facilities[6]—is profoundly injurious, doing them long-lasting psychological, developmental, and physical damage.

---

[5] Alternatively, the Government could have moved the district court to modify the Settlement to accord with changed circumstances, as this Court has previously admonished. *Flores v. Lynch*, 828 F.3d 898, 910 (9th Cir. 2016).

[6] *See, e.g.*, Declaration of Hector Boteo, March 1, 2016, Plaintiffs' Exhibits [ORR-Pt.2] (D.Ct. Dkt. 292-3) Exhibit 12-ORR, *reproduced at* Appendix 3, at ¶¶ 13, 15 ("Boteo") ("In Yolo, we live in a real prison. The food, the program, the life, the routine: everything is a penitentiary. They treat us badly, like delinquents. The entire time, we live locked up. ... They lock us up in the cells every night, to sleep on benches made out of cement with mattresses.").

- 4 -

- ORR detains children indefinitely without disclosing its reasons for doing so or affording them any opportunity to examine, explain, or rebut whatever evidence ORR believes justifies their detention. Often, the agency simply refuses to decide whether a child should be released, leaving him or her to wonder when or if it will decide to continue keeping him or her in custody and why.

- ORR fails to submit its detention decisions—if and when it eventually makes one—for review by a judge or other neutral adjudicator.

- ORR refuses to recognize that detained *children* have an independent right to be heard on whether they will be detained. Rather, the agency concerns itself *exclusively* with *proposed custodians*' right to receive a detained child, and then begrudgingly affords *only* parents a perfunctory administrative review of decisions to keep their children confined.

- ORR's procedures for deciding to detain a child are woefully ad hoc. According to the Staff Report of U.S. Senate Permanent Subcommittee on Investigations,

  > ORR's policies are kept and revised in an ad hoc manner. ... Under its current practice, ORR can make major changes to its placement procedures without notice ... Setting governmental policy on the fly— without basic public notice or even a clear record of revisions to that policy—is inconsistent with the accountability and transparency that should be expected of every administrative agency."

  Staff Report, U.S. Senate Permanent Subcommittee on Investigations,

  *Protecting Unaccompanied Alien Children from Trafficking and Other*

*Abuses*, Jan. 2016, at 26, *available at*

www.hsgac.senate.gov/download/majority-and-minority-staff-report_-

protecting-unaccompanied-alien-children-from-trafficking-and-other-

abuses-the-role-of-the-office-of-refugee-resettlement (last visited Aug. 9,

2016) ("Senate Staff Report").

The results of ORR's autocratic approach are predictable. ORR needlessly

detained Hector Boteo, for example, for 489 days without explanation,

presumably, though it never said so, because he was dangerous. Boteo at ¶ ;

Lawrence II at ¶ 3. Hector's attorney remarked the deterioration in her client's

mental health as months of confinement dragged on. Declaration of Helen

Lawrence, Sept. 2, 2016, Plaintiffs' Exhibits (D.Ct. Dkt. 253], *reproduced at*

Appendix 4 ("Lawrence I"), at ¶ 4 ("His aspect has transformed from one of

optimism and hope to depression and hopelessness... He reports suffering from

fatigue, despair, and insomnia. ..."). Shortly before last Christmas ORR released

Hector to the same caregiver who had sought his custody all along: his mother.

Lawrence II at ¶ 3. ORR could not have been injured, and certainly not irreparably,

had it afforded Hector an opportunity to be heard.

In 2014 ORR spent on average of $248 per day to hold a child in a "basic

shelter." Government Accountability Office, *Unaccompanied Alien Children:*

*Actions Needed to Ensure Children Receive Required Care in DHS Custody*,

GAO-15-521 (July 2015), at 67, *available at* www.gao.gov/assets/680/671393.pdf

(last visited Jan. 27, 2017) ("GAO Cost Report"). ORR accordingly spent *at least* $121,000[7] needlessly detaining Hector. If anything, the district court's order should save Defendant from its own profligacy. That is hardly an abuse of discretion.

II    DEFENDANT SATISFIES NONE OF THE REQUIREMENTS FOR ISSUANCE OF STAY.

The requirements Defendant must satisfy to receive a stay are well established:

> [T]he factors regulating the issuance of a stay are …: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Defendant bears the burden of establishing each of these requirements. *Nken v. Holder*, 556 U.S. 418, 433-34 (2009).

This Court reviews the district court's denial of a motion for stay for an abuse of discretion. *United States v. Peninsula Communs., Inc.*, 287 F.3d 832, 838 (9th Cir. 2002). ORR falls far short of establishing that the district court abused its discretion in declining to stay the order on appeal.

---

[7] The cost of housing a youth in secure facilities substantially exceeds that of non-secure placements. GAO Cost Report at 66 n103 ("According to ORR officials, the average cost per bed for secure and therapeutic shelters is generally higher than for basic shelters.").

**A    There is scant likelihood Defendant will prevail on appeal.**

Defendant must demonstrate "'either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor.'" *Tribal Village of Akutan v. Hodel*, 859 F.2d 662, 663 (9th Cir. 1988).

If Defendant succeeds only in raising a "serious legal question," however, it must demonstrate that the balance of equities tips *sharply* in its favor. *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983) (emphasis added).

The district court's order enforcing ¶ 24A cogently demonstrates that Defendant has little chance of succeeding on the merits of their instant appeal: indeed, it demonstrates that Defendant's appeal fails to raise even a serious legal question of law:

• The TVPRA and HSA savings provisions expressly maintain the Settlement in effect. Enforcement Order at 5.

• Neither the TVPRA nor the HSA bars ORR from affording detained children a bond hearing, but is silent with respect thereto. *Id*. "The Court will not presume Congress intended to silently abrogate the *Flores* Agreement's bond hearing provision..." *Id*. at 6.

• "[N]othing in the text of the TVPRA suggests it is intended to cover the whole immigration scheme for unaccompanied minors. In fact, the TVPRA specifically states that the care and custody of unaccompanied children must

- 8 -

be consistent with the Homeland Security Act." *Id*. at 7.

- "[M]inors have been languishing in secured, unlicensed detention facilities for over a year without a bond hearing and with no requirement that ORR/HHS justify the detainment. *Id*. Construing the TVPRA to strip children of their right to a hearing "could run afoul of the Constitution. That is, Defendants want this Court to construe the TVPRA in a way that could result in the indefinite detention of unaccompanied children without the due process protection offered to adult detainees through a bond hearing." *Id*.

In seeking a stay from this Court Defendant offers nothing new in the way of legal argument not considered and rejected by the court below. Yet even assuming, *arguendo*, Defendant were to present a serious question of law on appeal, its bid for a emergency stay would collapse under the elevated burden it must carry of proving that the equities tip *strongly* in ORR's favor.

## B  ORR's resuming compliance with a long-standing agreement does not constitute irreparable injury.

In evaluating a party's showing of irreparable injury, three factors control: (1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided. *Michigan Coalition of Radioactive Material Users, Inc*. *v*. *Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).

Among these factors, "'the key word ... is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.'" *Sampson v. Murray*, 415 U.S. 61, 90

- 9 -

(1974) (emphasis in original). "'Merely serious or substantial' harm is not irreparable harm." *Elias v. Connett*, 908 F.2d 521, 526 (9th Cir. 1990).

Defendant must provide *evidence* that irreparable harm has occurred in the past and is likely to occur again. *Id.*; *see also*, *Washington v. Trump*, No. 17-35105, _ F.3d __; 2017 U.S. App. LEXIS 2369, at *21 (9th Cir. Feb. 9, 2017) (declining to stay injunction where "Government has pointed to no evidence that any alien from any of the countries named in the Order has perpetrated a terrorist attack in the United States."). Such evidence must also establish that the allegedly irreparable harm is both certain and immediate, rather than speculative. *Wisconsin Gas Co. v. Federal Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Defendant offers two factual ways[8] in which the district court's order would injure it irreparably: First, ORR would have to figure out "how requests for such bond hearings can be submitted through HHS to the immigration courts, who represents the Government in such bond hearings, what the appropriate standard of review would be, and how HHS can incorporate the results of any such hearing into its reunification decisions under the TVPRA." Emergency Motion to Stay District Court Order, Feb. 17, 2017 (Dkt. No. 2-1), at 19 ("Stay Motion"). Second,

---

[8] Defendant's remaining claims regarding irreparable injury boil down to a reiteration of their legal claims, and that is not irreparable injury. *Washington v. Trump, supra,* 2017 U.S. App. LEXIS 2369, at *32 ("...Government claims that it has suffered an institutional injury by erosion of the separation of powers ... is not 'irreparable.' It may yet pursue and vindicate its interests in the full course of this litigation.").

Defendant asserts that its affording detained children a hearing would "improperly burden[] ... immigration judges with responsibilities that are not authorized under any statute or regulation ...." *Id*. These assertions fall far short of irreparable injury.

To begin, Defendant is clearly required to support its claims with *evidence*. *Washington v. Trump*, *supra*. Yet apart from statements in its moving papers, Defendant submitted *no* evidence to the district court to show that its order would cause ORR any injury at all, much less irreparable injury. Unsupported statements of counsel, of course, are not evidence, *British Airways v. Boeing Co*., 585 F.2d 946, 952 (9th Cir. 1978), *cert. denied*, 440 U.S. 981 (1979), yet Defendant gave the court below nothing more.

For the first time here, Defendant offers two declarations to support its claims of irreparable injury. Neither of those declarations offers *any* material fact that was not available to Defendant when it asked the district court to stay its order. Having withheld this evidence from the district court, Defendant is hardly in a position to complain that the district court abused its discretion in refusing it a stay. *Ruiz v. Estelle*, 650 F.2d 555, 567 (5th Cir. 1981) (denying stay where evidence "presented to this court ... [that was] not presented to the district judge ..."); *Chemical Weapons Working Group v. Department of the Army*, 101 F.3d 1360, 1362 (10th Cir. 1996) ("[F]undamentally different roles of appellate and trial courts mandate consideration of the new evidence by the district court under Fed. R. Civ. P. 62(c) before Rule 8 proceedings in this court."); *cf. Thompson v.*

- 11 -

*Calderon*, 122 F.3d 28, 29 (9th Cir. 1997) (denying emergency motion to stay execution where *newly discovered* evidence has "never been considered by the district court...").[9]

Second, even assuming, *arguendo*, Defendant were entitled to a stay based on evidence it withheld from the court below, its giving detained youth hearings would at most be inconvenient or entail extra cost, and it is apodictic that expense or inconvenience is *not* irreparable injury. *Sampson*, *supra*, 415 U.S. at 90.

Third, Defendant's having to tease out "the appropriate standard of review" and similar logistics is trivial. Determining a standard of review requires little more than a bit of legal research, surely a small matter for the Government's

---

[9] Defendant likewise raises arguments in support of a stay it never brought before the district court, even while it seemingly abandons others it did raise below. This is what it argued before the trial court:

> The Order ... irreparably harms the Government by: (1) interfering with the comprehensive statutory framework and corresponding policies and procedures governing HHS's care and custody of UACs; (2) creating uncertainty over the contours of these newly-mandated bond hearings that will be burden-intensive for the government to resolve, such as how to transport UACs to immigration court, who represents the Government in such bond hearings, and what the appropriate standard of review would be; and (3) improperly burdening immigration judges with responsibilities that are not authorized under statute or regulation ...

Memorandum in Support of Ex Parte Application for Stay (D.Ct. Dkt. 322-1), at 7-8.

This Court should not countenance Defendant's sporting approach to appellate practice: it should disregard theories of irreparable injury Defendant failed to raise before the district court.

- 12 -

multitudinous lawyers.

Fourth, ORR's suggesting it would be hard to find counsel to represent it in bond hearings is fatuous. Defendant has previously managed to find lawyers to oppose detained children's release, as well as determine the apposite standard of review and reconcile immigration judges' orders with the TVPRA. *E.g.*, *In Re: Rodriguez-Lopez*, 2004 WL 1398660 (BIA 2004); *Matter of A--*, 2005 Immig. Rptr. LEXIS 54924 (BIA 2005), Exhibit 7-ORR. Defendant offers no reason to believe it could not do so again.[10]

_____

[10] HHS and DHS are required to cooperate respecting release of unaccompanied minors, 6 U.S.C. § 279(b)(2), 8 U.S.C. § 1232(c)(2)(A); both HHS and DHS are represented by the Department of Justice before this Court. Defendant offers no reason DHS or the DOJ could not represent it in bond hearings, even in the event that HHS's own legal resources were to prove lacking.

Of course, unaccompanied children are regularly unrepresented in removal proceedings. *J. E. F.M. v. Lynch*, 837 F.3d 1026, 1038 (9th Cir. 2016) ("We also recognize that there are limited—and already more than stretched—pro bono resources available to help unaccompanied minors navigate the removal process.").

The uncontroverted evidence also establishes that ORR has hobbled legal aid lawyers from challenging its release decisions. Affidavit of Lorilei Williams, Aug. 5, 2016, Exhibit 10-ORR (D.Ct. Dkt. 239-2), at ¶ 16 (legal aid lawyer "told explicitly that we could not take legal action against ORR because our Vera Institute funding to help detained children would be at risk"); Declaration of Megan Stuart, July 29, 2016, Exhibit 11-ORR, *id.*, ¶¶ 22-24 (same).

One suspects ORR will end up finding plenty of lawyers to represent it in bond hearings. If it does not, it should hardly complain that it must contend on a relatively level playing field against an unrepresented, unaccompanied child.

Finally, ORR's arguing that the order on appeal might force it to share children's files with ICE is disingenous: it routinely shares such files of its own accord. Declaration of Helen Lawrence, *supra*, Exhibit A at ¶ 9 (DHS regularly "has had

Fifth, in ¶ 24A Defendant *agreed* that detained children would receive bond hearings, and therefore that the Government would accept the burden of given them such hearings. If the Government now thinks honoring its agreement unduly burdensome, it is free to negotiate modification of ¶ 24A or move the district court to reform the provision.

Sixth, by including savings clauses in both the HSA and TVPRA, Congress, with full knowledge of the Settlement, preserved ¶ 24A. Immigration judges' resuming doing what Congress said they should continue to do cannot possibly injure Defendant irreparably.[11]

Finally, any burden giving detained children hearings will cause will largely be offset by reducing the costs of needlessly confining them. Though it is impossible to predict how many detained children will receive bond hearings and thereafter win release,[12] such hearings will surely reduce children's detention

---

access to more of my child client's files that I have and access to th[ose] files before me.").

[11] Plaintiffs have suggested that HHS might itself afford detained children hearings equivalent to bond redeterminations. Exhibit 3-ORR (D.Ct. Dkt. 239-2). On the other hand, ORR's locking up children without a hearing at all is not an option; therein lies the apparent rub.

[12] Defendant's new-found declarant, James de la Cruz, opines that the district court's order may force ORR to produce thousands of children for bond hearings yearly. Declaration of James de la Cruz, Dkt. 2-4.

The short answer to Defendant's speculation is that if the Government can manage to confine children, it can afford to give them an opportunity to be heard.

overall and thereby, the government's costs of detaining them. *E.g.*, Declaration of Bryan Ortiz, Jan. 12, 2016, Exhibit 14-ORR (D.Ct. Dkt. 239-2), ¶¶ 11-15 (ORR detained class member without hearing for months, transferred him to ICE following his 18th birthday, which released him pursuant to immigration judge's order following bond hearing). Such savings could well be far from trivial.

As has been seen, ORR spent at least $121,000 needlessly detaining class member Hector Boteo. ORR likewise squandered at least $76,000 locking away class member Cesar Villalobos for 330 days without hearing, only to release him to his mother. Lawrence II at ¶ 4.

Worse still: ORR has now spent at least an astonishing $157,000 to confine class member Edwin David Aguayo Zavalza for more than a year and eight months without opportunity to be heard. *Id*. at ¶ 5 (Edwin taken into ORR custody May 8, 2015, where, as of January 30, 2017, he remained). ORR has *still* not said when it will release Edwin *or* give him a hearing on the cause for such seemingly interminable detention. *Id*.

In sum, Defendant's claims of irreparable injury (1) fail as a matter of law; (2) are wholly unsupported by timely evidence; and (3) are factually meritless

---

In any event, insofar as the number of hearings Defendant would have to arrange is concerned, the *only* pertinent evidence before the district court suggests that even ten days after being ordered to comply with ¶ 24A, ORR had still provided *no* child a hearing. Lawrence II at ¶ 5. Even were ORR to take the district court's order more seriously, there is no saying how many class members will exercise their right to a hearing.

regardless. Defendant has failed to carry its burden of showing that district court abused its discretion in denying a stay.

**C    Granting a stay would irreparably injure detained children.**

A stay is an equitable remedy, *Lopez, supra*, 713 F.2d at 1435, and the Court should therefore deny a stay if granting one would inflict irreparable injury on detained children.

It is virtually self-evident that needlessly detaining children is profoundly, injurious. *E.g.*, Declaration of Luis Zayas, December 10, 2014, Plaintiffs' First Set of Exhibits [Part 8] (D.Ct. Dkt. 101-7), Exhibit 24 at ¶¶ 1-6 ("The medical and psychiatric literature has shown that incarceration of children ... has long-lasting psychological, developmental, and physical effects.").

Class member Boteo's counsel observed the effects ORR detention had on her client:

> [O]ver the course of representing Estiven I observed a marked deterioration in his mental functioning. His aspect has transformed from one of optimism and hope to depression and hopelessness, which he attributes to prolonged detention with no end in sight. He reports suffering from fatigue, despair, and insomnia. He now appears isolated from his peers, and reports a preference for being alone. Estiven said that Yolo is "not a detention center, but an insane asylum" and has worried about his own mental health status after so much time detained.

Lawrence I at ¶ 44; *see also* Williams at ¶ 18 ("... I have noted the deleterious effects ORR's opaque and oft-delayed release and step-down decisions have on detained youth... [D]etained children—already traumatized by horrific experiences in their countries of origin—have expressed to me feeling profound helplessness

- 16 -

and despair...").

Such harm to children is irreparable. *Cf. United Steelworkers of America v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987) (irreparable injury shown where "... retired workers [denied health insurance] would likely suffer emotional distress, concern about potential financial disaster, and possibly deprivation of life's necessities (in order to keep up insurance payments)."); *see also Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001) (en banc) (family separation is irreparable injury).

Further, "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *de Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). As the district court held, Defendant's position demands it "construe the TVPRA in a way that could run afoul of the Constitution. That is, Defendants want this Court to construe the TVPRA in a way that could result in the indefinite detention of unaccompanied children without the due process protection offered to adult detainees through a bond hearing." Enforcement Order at 7. Denying detained children due process, therefore, itself constitutes irreparable injury regardless of whether a hearing results in release.[13]

---

[13] Defendant's sole riposte to the foregoing is familiar: the TVPRA, it contends, charges ORR with vetting class members' proposed custodians, and immigration judges accordingly lack absolute authority to order a child released.

But immigration judges have *always* reviewed dangerousness and flight-risk, and rarely, if ever, a proposed custodian's fitness. *See, e.g.*, *Matter of A*--, *supra*,

There was no abuse of discretion in the district court's so holding. Children would plainly be harmed irreparably were this Court to stay the district court's order; Defendant falls far short of carrying its burden to establish otherwise.

### D     The public interest is served when detained children receive neutral and detached oversight of the reasons for their confinement.

Defendant next attempts to show that a stay would serve the public interest by asserting that its interest is synonymous with the public's.[14]

Though Defendant would conflate the public interest with its own, the two

---

Exhibit 7-ORR. This limitation existed when the Settlement was signed, and ¶ 24A therefore guarantees detained children bond hearings even though release to a particular custodian may not occur. This hardly cancels the very real benefit of giving children an opportunity to be heard.

As the district court held:

> But identifying appropriate custodians and facilities for an unaccompanied child is not the same as answering the threshold question of whether the child should be detained in the first place—that is for an immigration judge at a bond hearing to decide. Assuming an immigration judge reduces a child's bond, or decides he or she presents no flight risk or danger such that he needs to remain in HHS/ORR custody, HHS can still exercise its coordination and placement duties under the TVPRA.

Enforcement Order at 6. "If the initial proposed custodian is unfit to care for the unaccompanied child under the TVPRA, Defendants should follow Paragraph 14 of the Flores Agreement, which outlines an order of preference for the minor's release, in order to effectuate the least restrictive form of detention." *Id*. at 6, n5.

[14] Here again Defendant's argument swerves from what it asserted before the district court, where it argued that the order on appeal undercuts (1) "the Executive's 'sovereign prerogative' of setting immigration policy," Defendant's Memo at 9; and (2) and ORR's "*parens patriae* interest" in exercising autocratic control over detained children. *Id*.

are not the same. Rather, the public interest inquiry "primarily addresses impact on non-parties rather than parties." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002).

Defendant relies on *Nken v. Holder*, *supra*, to suggest that "harm to the government is harm to the public interest. *See Nken*, 556 U.S. at 420." Emergency Motion at 23. Setting aside that Defendant jump cites to the reporter's syllabus, its reliance is misplaced.

Before the Court in *Nken* was an alien's application for stay of removal pending adjudication of a petition for review. 556 U.S. at 429. The Court held that a "court asked to stay removal cannot simply assume that '[o]rdinarily, the balance of hardships will weigh heavily in the applicant's favor.'" *Id.* at 436, and that it should therefore evaluate the parties' relative hardships in light of their particular circumstances. Though the Court observed that in most cases the Government's interest in removing an alien is congruent with the public's, it quickly cautioned, "Of course there is a public interest in preventing aliens from being wrongfully removed, ..." *Id.*

For its part, the district court held that ¶ 24A is actually consistent with the TVPRA, which requires Defendant to "promptly place [plaintiff children] in the 'least restrictive setting that is in the best interest of the child,'" Enforcement Order at 3, *quoting* 8 U.S.C. § 1232(c)(2)(A), and avoid confining them in secure facilities "absent a determination that the child poses a danger to self or others ..."

- 19 -

*Id*. The public clearly has no interest in ORR's flaunting what Congress itself has declared to be in the public interest. *Nken, supra*, 556 U.S. at 436.

In any event, Defendant again ignores that the Government *agreed* that detained children should have bond hearings, the court below approved that agreement pursuant to Rule 23(e), Fed. R. Civ. Proc., and in the HSA and TVPRA savings clauses Congress preserved that agreement. None of this would have happened had giving detained children hearings been contrary to the public interest.[15]

## III   CONCLUSION

For the foregoing reasons, this Court should find that the district court did not abuse its discretion in denying Defendant a stay. It should accordingly deny Defendant's emergency motion.

/ / /

---

[15] This Court should deny a stay as a matter of equity. A party seeking a stay appeals to equity. "'A stay is not a matter of right, even if irreparable injury might otherwise result.'" *Nken, supra*, 556 U.S. at 433. "It is instead 'an exercise of judicial discretion ...'" *Id*.

As has been seen, Defendant has (1) seemingly flaunted the district court's order; (2) offered evidence to this Court it withheld from the district court; and (3) delayed a full two weeks before seeking an "emergency" stay of the order on appeal.

This confluence of factors itself justifies the Court's exercising discretion to deny a stay. *Cf. Parretti v. United States*, 143 F.3d 508, 510 (9th Cir. 1998) ("The fugitive disentitlement doctrine empowers us to dismiss the appeal of a defendant who flees the jurisdiction of the United States after timely appealing. An appellate court's power to disentitle a fugitive from access to the appellate process is grounded in equity.").

Dated: February 20, 2017

Respectfully submitted,[16]

CENTER FOR HUMAN RIGHTS
AND CONSTITUTIONAL LAW
Carlos R. Holguin
Peter A. Schey

HOLLY COOPER
University of California Davis School of Law

YOUTH LAW CENTER
Virginia Corrigan


/s/ Carlos R. Holguín _____


/s/ Holly Cooper _____

---

[16] Plaintiffs' counsel wish to acknowledge the invaluable assistance of U.C. Davis student Fabián Sánchez Coronado in preparing the instant brief under extrardinarily demanding time constraints.

Exhibit A

DECLARATION OF HELEN LAWRENCE

I, Helen Lawrence, declare and say as follows:

1.       I submit this declaration in support of plaintiffs' opposition to stay enforcement of ¶ 24A of the *Flores* settlement. My experience and qualifications are set out in an earlier declaration I submitted in this matter. *See* Declaration of Helen Lawrence, September 2, 2016, Plaintiffs' Exhibits [ORR-Pt.3] (Dkt. #253), Exhibit 21-ORR

2.       Two of my clients- Edwin David Aguayo Zavalza and Fidel Enrique Peña Flores ("Enrique"), both who have a parent in the United States eagerly participating in the reunification process-  remain in secure ORR custody in Yolo.  Neither Edwin nor Enrique has ever been offered a bond hearing.

3.       Edwin has been in ORR custody since May 8, 2015. Most of that time he has been in secure custody.  He has been confined at Yolo longer than any other youth presently housed there. ORR has not disclosed to me why his release to his mother has not been approved. As far as I know, ORR has yet to decide whether Edwin should be released, or whether he should continue to be detained because he is dangerous or a flight-risk, or because it thinks his mother an unfit custodian. To date, ORR has still not presented Edwin for a bond redetermination hearing in accordance with ¶ 24A of the *Flores* settlement, nor has it advised me when it will present him for a bond hearing. I have not waived a bond hearing on my client's behalf.

4.       Enrique has been in ORR custody since March 20, 2016, quickly approaching a full year. To date, ORR has still not presented Enrique for a bond redetermination hearing in accordance with ¶ 24A of the *Flores* settlement, nor has it advised me when it will present him for a bond hearing. I have not waived a bond hearing on my client's behalf.

5.      I reiterate that I do not believe there are any substantial impediments to ORR's complying with ¶ 24A of the *Flores* settlement. Both Edwin and Enrique will both be transported to San Francisco this week for an individual hearing and an asylum interview, so there should be no additional challenge in transporting these children for bond hearings.

6.      In addition to my clients' prolonged, indefinite detention, I am concerned that ORR is sharing children's files with the Department of Homeland Security. In my direct representation of at least six detained children before the asylum office, the asylum officers (who are part of DHS) have had access to my clients' ORR files. Moreover, DHS has had access to more of my child clients' files than I have and access to the files before me.

7.      For example, I submitted an ORR file request for Enrique's ORR file on September 20, 2016. I followed up with ORR about this pending file request multiple times. Nonetheless, I did not receive the file before Enrique's asylum interview on December 8, 2016. After his asylum interview, on January 12, 2017, the asylum office requested his ORR file. On February 8, 2017, ORR emailed the asylum officer Enrique's file. On February 15, 2017, after a third inquiry into the status of my ORR file request for Enrique, I received his ORR file. As such, ORR processed DHS's request for Enrique's file prior to mine which had been pending for over four months. I know this timeline because when ORR finally processed by file request it did so by forwarding me the email chain between the asylum office and ORR.

8.      In Hector Estiven Boteo Fajardo and Cesar Ismail Villalobos Lima's cases, the asylum officers also had copies of these children's ORR files and referred to prejudicial information contained within them during their asylum adjudications. In both those cases, while I had some version of the ORR file for each child from my file requests, I did not have the same documents that the asylum officers had from ORR. DHS had access to more ORR documents

than were provided to me, the children's' attorney, in my file requests. During the interviews, DHS refused to provide me with the missing documents and even jokingly referred to it as "secret evidence."

9.      In my eight years of representing unaccompanied children, ORR files often contain confidential juvenile records in violation of state juvenile confidentiality laws. For example, both Cesar and Enrique's ORR files contain juvenile police reports from cases in which the juvenile charges were completely dismissed. These juvenile police records are confidential and typically require that a party request permission through the state juvenile court along with notice to the child in order to share this sensitive, protected information. That state court process was not adhered to in the sharing of those records with ORR, nor in ORR's sharing of those records with DHS. As such, in my experience in Enrique, Cesar, and other children's cases, ORR illegally shares illegally obtained juvenile records with DHS- often before the child's attorney has access to them or the child's attorney is never provided these documents.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 20th day of February of 2017, in Oakland, California.


_____

HELEN LAWRENCE

Exhibit B

## DECLARATION OF CECILIA B. CANDIA

I, Cecilia B. Candia, declare and say as follows:

1.      I am a staff attorney employed at Legal Services for Children, located in San Francisco, California

2.      Legal Services for Children is the legal service provider serving the three Office of Refugee Resettlement ("ORR") facilities housing detained unaccompanied minors in Northern California. As part of our work, we provide Know-Your-Rights presentations and legal screenings for detained children. We also serve as friend-of-court for the juvenile detained docket in San Francisco and provide legal representation for children who wish to pursue immigration relief and are facing prolonged deportation.

3.      I staffed the juvenile detained docket in San Francisco on February 13, 2017. There were four children on the docket, two of whom I represent. One of my clients has been detained in ORR custody since May of 2016 the second client has been detained since November of 2016. The remaining two children who had court on February 13, 2017 were not my clients, but I appeared as friend-of-court.

4.      None of the four children on the February 13, 2017 detained juvenile docket were informed by ORR or the Department of Homeland Security that they might be eligible for a Bond Hearing.

I declare under penalty of perjury that the above declaration is true and correct to the best of my knowledge and belief.

Executed this 20th day of February of 2017, in Oakland, California.

_CBCandia_

CECILIA B. CANDIA

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 20, 2017.

I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system:

> Sarah B. Fabian
> Vinita B. Andrapalliyal
> United States Department of Justice
> Civil Division
> Office of Immigration Litigation
> District Court Section
> P.O. Box 868, Ben Franklin Station
> Washington, DC 20044

Dated: February 20, 2017          _____

Carlos Holguín